NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 9, 2008
Decided August 8, 2008

**Before**

RICHARD A. POSNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-2704

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District Court for the Southern |
| *Plaintiff-Appellee*, | District of Illinois. |
| *v.* | No. 06 CR 30146 |
| BYRON BLAKE, | G. Patrick Murphy, |
| *Defendant-Appellant*. | *Judge.* |

**O R D E R**

Byron Blake was convicted on drug charges after a jury trial.  On appeal he raises a litany of arguments, but only two warrant serious consideration: that the district court at sentencing erred in making its drug-quantity finding and at trial should have excluded testimony that Blake tried to intimidate a witness.  The drug-quantity finding is somewhat questionable, but because Blake's sentencing range would have been the same even if the quantity finding had been substantially lower, we affirm his sentence.  The intimidation evidence was not unfairly prejudicial because of its significant value in showing Blake's consciousness of guilt.  Blake's other appellate arguments, all of which concern alleged trial errors that prompted no contemporaneous objection, are without merit.  Accordingly, we affirm his conviction and sentence.

**I. Background**

Blake's troubles began when federal agents targeted drug dealer Ryan Ivory. They determined that Blake was Ivory's supplier and tapped Blake's phones. Then they sent two informants wearing hidden microphones and video cameras to buy drugs from Ivory. Both times, Ivory called Blake who then delivered the drugs for the sale. Next, the authorities raided two of Blake's residences and his business, Club Escape. Those searches yielded scales, cell phones, marijuana, cocaine, and loaded guns. The government charged Blake with conspiracy to distribute crack, 21 U.S.C. §§ 846, 841(a)(1), possession with intent to distribute crack, *id.* § 841(a)(1), and possession with intent to distribute cocaine, *id.*

At trial the government presented overwhelming evidence against Blake. The two informants who made the buys testified. Ivory, a coconspirator who pleaded guilty and cooperated with the government, testified about those buys and about a long-term arrangement in which Blake had regularly fronted him 4.5 ounces of crack or powder cocaine. (As discussed in more detail below, Ivory's testimony was ambiguous regarding some specifics of the arrangement.) The government introduced the audio and video recordings made by the informants, audio recordings of phone calls between Blake and Ivory, and phone records corroborating the informants' testimony about the phone calls they made to Ivory and that Ivory made to Blake during the two deals. The government also presented the testimony of the agents who arranged the deals, along with the videos they made showing Blake delivering the drugs.

Richard Pittman, who had been held in pretrial detention with Blake, testified that Blake asked him if he thought Michael Woods, one of the informants, would take money not to testify. Pittman also testified that Blake was interested in where Woods's mother and other family members lived and that Blake asked Pittman if he thought that Woods could be convinced not to testify if someone threatened his mother. Pittman understood Blake to be asking him to send a message to Woods that if Woods testified, his mother would be harmed.

Finally, the government introduced the drugs from the two deals and the testimony of a chemist who said she had performed three different tests on those drugs. She testified that the results of the tests showed that the drugs from the first transaction constituted 113 grams of crack and the second, 123 grams of powder cocaine. After two and a half days of trial, the jury found Blake guilty on all three counts.

At sentencing the district court adopted the probation officer's finding, based entirely on Ivory's trial testimony, that Blake was responsible for more than 13 kilograms of crack. Blake had argued unsuccessfully that Ivory's testimony was not reliable as to drug

quantity or drug type—that is, crack or powder—and that his guidelines range should have been based only on the quantity of drugs actually seized. Grouping all three counts together, *see* U.S.S.G. § 3D1.2(d), the court began with a base offense level of 38, *id.* § 2D1.1, to which it added 4 levels because it found Blake to be an organizer or leader of a criminal activity involving five or more participants, *id.* § 3B1.1(a), and 2 levels for obstruction of justice, *id.* § 3C1.1. Combined with Blake's criminal history score of III, this yielded a guidelines range of life, but the district court chose to impose a total sentence of 420 months, reasoning that sentencing Blake to die in prison for his crime was too harsh.

## II. Analysis

Blake raises a raft of issues on appeal, but only two—the drug quantity used at sentencing and the threat evidence—merit extended discussion. We discuss drug quantity in Part A, the threat evidence in Part B, and the remaining issues in Part C.

### A. Drug Quantity Used at Sentencing

Blake's first substantial argument is his challenge to the drug quantity and type used to compute his sentence. The probation officer's finding of 13 kilograms of crack, on which the district court relied, was based on Ivory's trial testimony. Ivory testified that about five or six years before trial he was buying drugs from someone he knew to be supplied by Blake, but at some point he started buying directly from Blake. Ivory first testified that the original arrangement lasted "[m]aybe two years," but in answering a specific question about when he started buying from Blake, Ivory responded, "Maybe two years ago." Ivory did not clarify whether he meant two years before the March 2007 trial or two years before his October 2006 arrest. Ivory said that at the start of the relationship, he was buying an ounce of crack or powder cocaine from Blake every three days or so, but that as sales increased, Blake started fronting him 4.5 ounces at a time. Ivory did not say when during the relationship Blake started fronting him drugs, and, oddly, after Ivory had said that the drug Blake was fronting him was crack, the prosecutor interjected, "Usually crack," before asking his next question. The probation officer probably relied upon the following testimony that summarized Ivory's relationship with Blake:

> Q.  About how often would – when did Blake start fronting you drugs as opposed to you buying them?
> A.  About two years ago.
> Q.  About two years ago.
>     And about how often would Blake front you these four-and-a-half ounces?

A.　On a weekly basis.
Q.　Every week?
A.　Yeah.
Q.　For two years?
A.　Yeah.

The probation officer read this testimony to mean that Blake had provided Ivory with 4.5 ounces of crack every week for two years and computed a total of 468 ounces or about 13 kilograms.

Blake argues that Ivory's testimony was unreliable, and the government correctly responds that the district court was free to credit Ivory's testimony. *See, e.g., United States v. Abdulahi,* 523 F.3d 757, 761 (7th Cir. 2008). But this dispute is beside the point; Ivory's testimony can be both reliable and not supportive of the probation officer's calculation. Although a district court "has leeway to extrapolate quantities from witnesses' statements of minimum sales over several occasions," *United States v. Noble,* 299 F.3d 907, 911 (7th Cir. 2002), any such extrapolation must be correctly calculated from those statements, *see, e.g., United States v. Eschman,* 227 F.3d 886, 889-91 (7th Cir. 2000); *United States v. Acosta,* 85 F.3d 275, 282-83 (7th Cir. 1996). At sentencing, the court can consider only information that has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

The district court did not make an independent assessment of the trial evidence but instead rested its quantity determination on the probation officer's calculation. That calculation, however, was not sufficiently reliable because, first, the probation officer read Ivory's testimony to mean that he was in a fronting arrangement with Blake for exactly two years. But immediately before Ivory answered "yes" when the prosecutor asked if the relationship had *lasted* for two years, Ivory had said that the relationship *began* "two years ago." Two years *before* trial was March 2005, and, indeed, the government's brief includes a citation to Ivory's testimony for the very proposition that he and Blake commenced their relationship in 2005, not earlier. That relationship necessarily ended in October 2006, when Blake and Ivory were arrested, which would add up to a total of 19 months, not 24, and a drug quantity of only 370 ounces or about 10.5 kilograms. And further undermining the probation officer's calculation, there is record evidence contradicting Ivory's testimony that Blake always fronted him crack: one of the deals that an informant initiated with Ivory was supposed to be for crack, but Blake delivered powder cocaine instead. Perhaps that is why after Ivory testified that what Blake was fronting him was crack, the prosecutor clarified that it was "usually crack."

These unexplained discrepancies call into question the reliability of the probation officer's calculation that Blake was responsible for 13 kilograms of crack. But that does not

mean that the district court was required to, as Blake suggests, use a drug quantity based only on the drugs that were actually seized. Instead, the district court should have attempted to resolve the inconsistencies in Ivory's testimony to reach a reasonable estimate of drug quantity. *See, e.g., United States v. Hollins*, 498 F.3d 622, 631-32 (7th Cir. 2007). Even so, there was no error in the district court's choice of base offense level because the drug quantity used, 13 kilograms of crack, is so much greater than the 1.5 kilograms required to reach the level 38 assigned by the court to Blake. To arrive at that base offense level, the court did not have to believe, as the probation officer apparently did, that Blake fronted Ivory 4.5 ounces of crack per week for two years. The court needed only to believe that over the course of their relationship, Blake fronted Ivory a total of 1.5 kilograms of crack, which is equivalent to only 12 deliveries of 4.5 ounces of crack, or about three months of the relationship Ivory claimed lasted for two years. Such an estimate is reasonable, *cf. United States v. Acosta*, No. 06-1519, 2008 WL 2738062, at *6 (7th Cir. July 15, 2008), so the court's offense-level calculation was not error. And Blake does not argue that even given the same offense level, a finding of a lower drug quantity would have had an impact on the ultimate sentence imposed. Thus, we affirm Blake's sentence.

## B. Threat Evidence

Blake's only other remotely substantial argument on appeal is that Pittman, who had been detained with Blake, should not have been allowed to testify about the threats Blake made against Woods, one of the two informants. When Pittman began to testify, Blake's counsel objected, but only on the ground that Pittman's testimony would alert the jury to the fact that Blake had been jailed. The district court overruled that objection, and now Blake argues that the testimony should have been excluded for an entirely different reason: he says that its potential for prejudice outweighed its probative value. *See* FED. R. EVID. 403. Because Blake did not make this argument in the district court, to succeed on appeal he must establish that it was plain error to admit Pittman's testimony, *see United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005), which he cannot do because there was no error at all.

As the prosecutor explained to the district court, the government introduced the evidence of Blake's threat to show consciousness of guilt, and for that purpose the evidence was highly probative. True enough, like any evidence against a defendant, Pittman's testimony was prejudicial, but it is hard to see how that prejudice was "unfair" or how the probative value could have been outweighed by it. *See* FED. R. EVID. 403. Courts routinely admit threat evidence to show consciousness of guilt. *See, e.g., United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006); *United States v. Perez*, 387 F.3d 201, 208-10 (2d Cir. 2004); *United States v. Miller*, 276 F.3d 370, 374 (7th Cir. 2002); *United States v. Flick*, 516 F.2d 489, 495 (7th Cir. 1975). We have cautioned against the use of such evidence when it is introduced by a party solely to bolster the credibility of one of its own witnesses, *see United*

*States v. Thompson*, 359 F.3d 470, 476 (7th Cir. 2004); *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996), or when its use is obviously pretextual, *see Dudley v. Duckworth*, 854 F.2d 967, 972 (7th Cir. 1988). Neither concern is present here.

### C. Other Arguments

Blake also complains about other pieces of evidence that the government introduced at trial, but he concedes that because he failed to object to the admission of any of that evidence, review here is limited to plain error. *See United States v. Tolliver*, 454 F.3d 660, 664 (7th Cir. 2006). Even if Blake shows that evidence was admitted in error, that the error was obvious, and that it affected his substantial rights, we still will not reverse unless Blake also shows that the error seriously affects "the fairness, integrity, or public reputation of judicial proceedings." *United States. v. Olano*, 507 U.S. 725, 736 (1993). In other words, Blake must show that the outcome of the trial probably would have been different absent the evidence in question. *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006).

The first piece of evidence Blake complains about is testimony by Ivory, his coconspirator, that he saw Blake with a gun and that Blake kept guns at Club Escape:

> Q. In the course of your dealings with Blake, did you ever see him with any guns?
> A. Not as far as with no dope, no.
> Q. Not with any dope, but did you know him to keep any guns anywhere?
> A. I done seen him with a gun before, yes.
> Q. Where was that?
> A. At his club.
> Q. Did he keep guns at the club?
> A. Yes.
> Q. And you said occasionally he would keep drugs at the club, too?
> A. Yeah.
> Q. Do you remember what kinds of guns he would keep at the club?
> A. Little autos, they were like 9 millimeters or something like that.
> Q. Pistols?
> A. Yeah.

Blake argues that admitting this testimony was plain error because under Federal Rule of Evidence 404(b), evidence of "other crimes, wrongs, or acts" is not admissible absent reasonable notice in advance of trial. *See, e.g.*, *United States v. Blount*, 502 F.3d 674, 677 (7th Cir. 2007). As the government points out, though, gun possession is not evidence of "other crimes, wrongs, or acts" because most guns are lawfully possessed and the government

never suggested that Blake's possession was unlawful. Guns are tools of the drug trade and so they are relevant in drug cases, *see, e.g.*, *Price*, 418 F.3d at 779, and when no evidence suggests that the gun ownership was illegal, advance notice of the evidence is not required under 404(b). Thus, admission of Ivory's testimony about Blake's gun ownership was not error.

Next, Blake points to three statements that he says should have been excluded because in his view, they are inadmissible hearsay. In fact, though, not one of the statements is hearsay. Woods twice testified to statements that Ivory made about Blake, first reporting on Ivory's boasting about Blake's extravagant lifestyle and second reporting that Blake was preparing crack for Woods and Ivory and that they should return to Ivory's house. Both remarks fit squarely within the definition of coconspirator statements and, therefore, are not hearsay. *See* FED. R. EVID. 801(d)(2)(E); *United States v. Price,* 516 F.3d 597, 607 (7th Cir. 2008) (statements aimed at recruiting new members to conspiracy); *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) (statements regarding "supply, demand, transportation, and finances"). The same goes for the third statement Blake believes to be hearsay. A law enforcement agent testified that "we learned that Blake was currently [Ivory's] source of supply for larger amounts of cocaine and crack cocaine." In his brief, Blake suggests that the agent's testimony was based on statements made by Ivory. As just explained, though, such evidence would not have been hearsay because Ivory was a coconspirator. *See* FED. R. EVID. 801(d)(2)(E). More importantly, though, it is not even clear that the agent's testimony rested on an out-of-court "statement." *See id.* at 801(a). As the government points out, the agent could have learned that Blake was supplying drugs to Ivory simply by observing a drug delivery and the act of delivering drugs is not a "statement." Because Blake failed to object to the evidence, the record is not sufficient for him to show that its admission was error.

Blake also complains that government witnesses were allowed to testify regarding the processes they went through to tap Blake's phones and get pen register information. Admission of such evidence is error because the jury might discern that senior government attorneys and a judge all suspected the target of wrongdoing. *United States v. Cunningham*, 462 F.3d 708, 712-13 (7th Cir. 2006). As we held in a very similar case, though, the error does not require reversal because it affected neither Blake's substantial rights nor the fairness and integrity of the trial. *See United States v. McMahan*, 495 F.3d 410, 416-19 (7th Cir. 2007), *vacated on other grounds sub nom. Smith v. United States*, 128 S. Ct. 917 (2007). That is so because of the overwhelming evidence of Blake's guilt: testimony by three participants in the drug deals, video and audio recordings made by two participants in the drug deals and by agents watching the deals, recordings of relevant phone calls, and more.

Finally, Blake points to the government's rebuttal argument and contends that it contained improper comments regarding the presumption of innocence. Because, once again, Blake failed to raise a contemporaneous objection, this issue is also reviewed for plain error only. *See United States v. DeSilva*, 505 F.3d 711, 717-18 (7th Cir. 2007). In relevant part, the prosecutor told the jury the following:

> So I'm just going to leave you with this: Yes, reasonable doubt is a high standard for the government. It acts in all of our day-to-day lives as a shield. It protects us. It is good for everyone. It protects us all from being convicted of something we didn't do.
>
> But there is another side to reasonable doubt. And that's this: When you do show evidence beyond a reasonable doubt of a crime, the evidence is so great that it meets and surpasses that standard, as it does in this case, that *reasonable doubt isn't a shield anymore and you can't hide behind it.* When that's the case, as in this case, there is only just one thing you can do and that's convict.

(Emphasis added.) Blake contends that these statements are equivalent to suggesting that the government's evidence had removed the presumption of innocence and such a suggestion would indeed be improper. *See, e.g., Kellogg v. Skon*, 176 F.3d 447, 451 (8th Cir. 1999); PATTERN CRIMINAL FEDERAL JURY INSTRUCTIONS FOR THE SEVENTH CIRCUIT 2.03 (The presumption of innocence "continues during every stage of the trial and your deliberations on the verdict."). These statements, however, suggested not that the presumption was removed, but that it was rebutted; that suggestion is not problematic. *See United States v. Crumley*, 528 F.3d 1053, 1065 (8th Cir. 2008). Even if the prosecutor's comments were improper, based on the overwhelming evidence that the government presented against Blake and the jury instruction the judge gave about the presumption of innocence, the comments did not constitute plain error requiring reversal because the outcome of the trial would not have been different without them. *See DeSilva*, 505 F.3d at 718.

AFFIRMED.